Joseph **GOLDEN**, Angelo Deitos, Edward Jones, Luther Palmer, Caroline Forys, Josephine Thomas, Stephen Santangelo, John Hoyle, Arthur Sallis, Thelma Songer, John W. Galloway and Roger Farrar, on behalf of themselves and a class of persons similarly situated, Plaintiffs,

v.

**KELSEY–HAYES COMPANY and Hayes Wheels International, Inc., Defendants.**

Civil Action No. 93–40530.

United States District Court, E.D. Michigan, Southern Division.

Jan. 31, 1997.

William A. Wertheimer, William Wertheimer Assoc., Royal Oak, MI, for UAW L78.

Roger J. McClow, Klimist, McKnight, Sale, McClow & Canzano, P.C., Southfield, MI, for John Hoyle.

Mark T. Nelson, Diane M. Soubly, Richard E. Rassel, Barbara L. McQuade, Butzel, Long P.C., Detroit, MI, Kirk D. Messmer, Julia A. Martin, Matkov, Salzman, Madoff & Gunn, Chicago, IL, for Kelsey Hayes Co.

Jay G. Swardenski, Matkov, Salzman, Madoff & Gunn, Chicago, IL, for Hayes Wheels Intl.

John Mucha, III, Pepper, Hamilton & Scheetz, Detroit, MI, for Towers Perrin.

### *MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT*

GADOLA, District Judge.

This matter is before the court on plaintiffs' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). Plaintiffs represent a class of individuals seeking relief under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, and under § 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, from defendants Kelsey–Hayes Company and Hayes Wheels International (collectively "Defendants") for breach of a collective bargaining agreement ("CBA") and a welfare benefit plan. The court held a

hearing on plaintiffs' motion on January 16, 1997. For the reasons discussed below, the court will grant plaintiffs' motion.

## I. Background

Plaintiffs are a class of retired hourly wage employees of the defendants, or their surviving spouses. They claim that defendants breached their promise to provide lifetime retiree health benefits at no cost. Defendants provided health care benefits for plaintiffs pursuant to successive collective bargaining agreements with the United Auto Workers ("UAW"). This action involves plaintiffs from four separate bargaining units, each with its own set of successive contracts: (1) the Detroit, Michigan and Romulus Michigan units ("Detroit/Romulus"); (2) the Heintz Division in Philadelphia, Pennsylvania ("Heintz"); (3) the SPECO Division in Springfield, Ohio ("SPECO"); (4) the Gunite Division in Rockford, Illinois ("Gunite").[1] Each of the collective bargaining agreements at issue contain similar insurance agreements that provide health care coverage for retirees and surviving spouses at specific negotiated levels.

In July 1987, defendant Kelsey–Hayes Company, who manufactured automobile brakes and wheels, sold its Heintz, Gunite, and SPECO Divisions. As part of the purchase agreement, defendant has continued to provide health insurance benefits for those employees who had retired before the closing date of the sale of the divisions, and to their spouses, and to the surviving spouses of deceased retirees.

In December of 1992, Kelsey–Hayes split into two companies: Kelsey–Hayes Co., which continued the brake business, and Hayes Wheels International[2], which continued the wheel business.[3] When the company split, the new Kelsey–Hayes (see Footnote 3) took three plants[4], and Hayes Wheels took one plant[5]. Kelsey–Hayes continues the sponsorship of health insurance benefit plans for all pre-split retirees, including those who are retired from the three plants sold in 1987, while each company sponsors the plans for its own post-split retirees.

In April 1993, defendants notified plaintiffs that starting January 1, 1994, they would modify retiree and surviving spouse health care benefits so as to require the payment of premiums and deductibles. Defendants would thereafter require payment of a monthly premium, an out-of-pocket deductible of $300 per person and $600 per family, and a twenty percent co-pay until an annual out-of-pocket maximum of $2,000 for an individual and $4,000 per family is reached. These changes affected the instant class of retirees and their spouses from five different plants.[6]

The plaintiffs filed this action as a class action on November 12, 1993.[7] On December 23, 1993, plaintiffs filed a motion for a preliminary injunction to restrain Kelsey Hayes from implementing the modifications to their health benefits.[8] On March 14, 1994,

1. Also pending before this court are class actions involving hourly wage employees or their surviving spouses from defendant Kelsey–Hayes' Jackson, Michigan plant, *see Hinkley et al. v. Kelsey–Hayes Co.*, 4:93–CV–40528, and salaried employees or their surviving spouses from various Kelsey–Hayes plants. *See Helwig et al. v. Kelsey–Hayes Co. et al.*, 4:94–CV–40512.

2. Hayes Wheels International was added as a defendant on December 20, 1994.

3. Actually, the corporation called Kelsey–Hayes Co. continued in existence, but changed its name to Hayes Wheels. Also, a new corporation was formed which adopted the name Kelsey–Hayes Co.

4. Kelsey–Hayes took the Detroit, Milford and Brighton plants.

5. Hayes Wheels took the Romulus plant.

6. The three sold plants plus each company's own plant.

7. This court certified the class on April 25, 1995. The class consists of approximately 2960 pensioners and spouses.

8. Prior to the hearing on the preliminary injunction, one of the UAW locals negotiated new CBAs for two of the plants at issue, one owned by Kelsey–Hayes, the other by Hayes Wheels. During these negotiations, both Kelsey–Hayes and Hayes Wheels entered into separate letter agreements with the local union rescinding virtually all the changes to the retiree health plans for those two plants, retroactive to January 1, 1994, and subject to the outcome of this litigation. As a result, the plaintiffs withdrew their request for a preliminary injunction as to retirees from those two plants.

this court entered a preliminary injunction directing Kelsey–Hayes to reinstate health insurance benefits to pre–1994 levels for retirees of the three remaining plants affected by the injunction.[9] Kelsey–Hayes appealed the preliminary injunction. On January 18, 1996 the Sixth Circuit affirmed this court's grant of a preliminary injunction.

Plaintiffs base their motion on two distinct grounds. The first ground relies on statutorily required summary plan descriptions[10] ("SPD"s) that were issued by Kelsey–Hayes in 1977 and 1984. Those SPD's, plaintiffs argue, are identical to the 1977 salaried SPD which the Sixth Circuit held, in *Helwig. v. Kelsey–Hayes*, 93 F.3d 243, 250 (6th Cir. 1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 690, 136 L.Ed.2d 613 (1997), contains "clear, unambiguous promises of lifetime coverage. . . ." Therefore, plaintiffs conclude that welfare benefits vested for every employee and every surviving spouse of an employee who retired between 1977 and January 1, 1994[11] and summary judgment is appropriate on this ground as to those class members.

For the second ground, which applies not only to the remaining class members but to the entire class and as such is an alternative basis for granting summary judgment to those class members covered by the first ground, plaintiffs rely on the collective bargaining agreements. Plaintiffs argue that, based on the Sixth Circuit's holding in *UAW v. Yard–Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983), *cert. denied* 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1989), the CBAs themselves provide for lifetime health care benefits. Any ambiguity in the CBA language, plaintiffs argue, is resolved by other provisions in the CBA or extrinsic evidence which demonstrates that Kelsey Hayes agreed to provide retirees with lifetime health care coverage.

9. The three plants are the Heintz, Gunite, and SPECO facilities. These are the same three plants that Kelsey–Hayes sold in 1987.

10. Under ERISA, the employer is required to distribute to employees summary plan descriptions. *See* 29 U.S.C. § 1022.

11. While an exact figure was not provided to the court, counsel for the respective parties agree

*Relevant Facts Regarding The SPD's.*

The 1977 SPD's for Detroit/Romulus, Gunite and Heintz hourly employees contain the following language with respect to retirees and surviving spouses:

The Insurance Program provides protection for you and your eligible dependents against a wide range of health care expenses while you are an active employee and after your retirement.

*KELSEY HAYES PAYS THE FULL COST . . .*

When you are retired, your life insurance and all of your Health Care coverage, except for vision, are continued without cost to you . . .

If you terminate employment at Kelsey Hayes at age 65 or older for any reason other than discharge for cause, all of your Health Care coverage, except for vision care, will be continued for the rest of your life at no cost to you.

Kelsey–Hayes also pays the full cost of Health Care coverage, except vision care, for surviving spouses and eligible children of deceased pensioners and of employees who die after they are eligible to retire voluntarily under the Kelsey Hayes pension plan.

*CONTINUING INSURANCE AFTER AGE 65*

All of your Health Care coverage are continued after age 65 whether you work for Kelsey Hayes or not, except that vision coverage is provided only while you are actively at work.

*HEALTH CARE BENEFITS FOR SURVIVORS*

If you die after retirement or after you are eligible to retire voluntarily under the Pension Plan, all Health Care (except Vision)

that approximately seventy to seventy-five percent of the class retired during 1977 and January 1, 1994. This number is based on agreed to effective dates for the 1977 SPD's. Those dates are, for the Detroit/Romulus, Gunite and Heintz plants, those employees who retired on or after December 1, 1977 and for the SPECO plant, those employees who retired on or after March 1, 1978.

benefits will be provided and Kelsey Hayes will pay the full cost.

The 1977 SPD for the SPECO hourly employees contains the following language with respect to retirees and spouses:

The Insurance Program provides protection for you and your eligible dependents against a wide range of health care expenses while you are an active employee and after your retirement.

*KELSEY HAYES PAYS THE FULL COST*

When you are retired, your life insurance and all of your Health Care coverage, except for dental, are continued without cost to you.

Kelsey Hayes pays the full cost of Health Care coverage, except dental care, for surviving spouses and eligible children of deceased pensioners and of employees who die after they are eligible to retire voluntarily under the Kelsey Hayes Pension Plan or are receiving Surviving Income Benefits.

*HEALTH CARE BENEFITS FOR SURVIVORS*

If you die before you are eligible to retire voluntarily, your surviving spouse and dependent children are eligible while receiving survivor income insurance benefits to be covered for the same Health Care benefits (except Dental) as were available to you. The full cost of this protection is paid for by the Kelsey Hayes Company.

If you die after retirement or after you are eligible to retire voluntarily under the pension Plan, all Health Care (except Dental) benefits will be provided and Kelsey Hayes will pay the full cost for the lifetime of your surviving spouse.

The 1984 SPD's for Detroit/Romulus, Gunite and Heintz contain the following provisions:

The Insurance Program provides protection for you and your eligible dependents against a wide range of health care expenses while you are an active employee and after your retirement.

*KELSEY–HAYES PAYS THE FULL COST*

Still when you are retired from active service and are receiving benefits under the Pension Plan (except for vested benefits) your life insurance (at reduced level shown on page 26) and all of your Health Care coverages are continued without cost to you.

If you terminate employment with Kelsey–Hayes at age 65 or older for any reason other than discharge for cause, all of your Health Care coverage will be continued for the rest of your life without cost to you. Kelsey–Hayes also pays the full cost of Health Care coverage for surviving spouses and eligible children of deceased pensioners and of employees who die after they are eligible to retire voluntarily under the Kelsey–Hayes Pension Plan. Kelsey–Hayes also pays the full cost of these coverages for your surviving spouse and eligible dependents until your spouse dies or remarries, if you die as a result of an accidental bodily injury caused solely by employment with Kelsey–Hayes.

*HEALTH CARE BENEFITS FOR SURVIVORS*

If you die after retirement or after you are eligible to retire voluntarily under the Pension Plan all Health Care coverages that were available to you will be provided to your surviving spouse and eligible dependents. Kelsey–Hayes will pay the full cost. Kelsey–Hayes also pays the full cost of these coverages for your surviving spouse and eligible dependents until your spouse dies or remarries, if you die as a result of an accidental bodily injury caused solely by employment with Kelsey–Hayes.

The 1984 SPD for SPECO contains the following provisions governing retiree health care benefits:

The Insurance Program provides protection for you and your eligible dependents against a wide range of health care expenses while you are an active employee and after your retirement.

*KELSEY HAYES PAYS THE FULL COST*

When you are retired from active service and are receiving benefits under the Pension Plan (except deferred vested benefits), your life insurance (at a reduced level

shown on page 26) and all of your Health Care coverages (other than dental and vision) are continued without cost to you.

If you terminate employment with Kelsey–Hayes at age 65 or older for any reason other than discharge for cause, all of your Health Care (other than dental and vision) coverage will be continued for the rest without cost to you.

*HEALTH CARE BENEFITS FOR THE SURVIVORS*

If you die before you are eligible to retire *voluntarily,* your surviving spouse and dependent children are eligible while receiving survivor income benefit insurance to be covered for the same Health care coverage (except dental and vision) as were available to you. The full cost of this protection is paid for by Kelsey–Hayes.

*If you die after retirement,* or after you are eligible to retire voluntarily under the Pension Plan, all Health Care coverages (except dental and vision) that were available to you will be provided to your surviving spouse and eligible dependents.

### Relevant Facts Regarding The Collective Bargaining Agreements.

#### The Collective Bargaining Agreements.

In 1965, during collective bargaining negotiations with the UAW and its Locals, Kelsey–Hayes agreed to provide fully paid health care coverage for retirees at Detroit/Romulus, Heintz, Speco and Gunite. Kelsey–Hayes also agreed to allow surviving spouses to continue in the group health care plan by paying the group cost of coverage.

In 1968 negotiations with the UAW, Kelsey–Hayes agreed to pay the full cost of health care coverage for surviving spouses of retirees and surviving spouses of employees eligible to retire.

By 1965 Kelsey–Hayes had agreed in negotiations with the UAW to provide survivor income benefits to surviving spouses of deceased active employees. These survivor income benefits included monthly "transition" benefits, payable for 24 months and a monthly bridge benefit, provided the surviving spouse was eligible, until age 62, death, re-

marriage or receipt of unreduced federal social security benefits.

At SPECO, effective September, 1968, Kelsey–Hayes agreed to pay the cost of health care coverage for surviving spouses of deceased active employees, who were not eligible to retire at the time of their death, for as long as the surviving spouse was entitled to receive survivor income benefits.

The 1980 Insurance Supplement between the UAW, Local 78 and Kelsey–Hayes covering Detroit/Romulus employees, contains the following provisions regarding health care benefits for retirees and surviving spouses:

> The Company shall contribute the full premium or prescription charge for ... Coverage ... for ... [a] retired employee ... provided such retired employee is eligible for benefits under Article II of the ... Pension Plan ... (1980 Detroit/Romulus Insurance Supplement, Article I, § 3(b)(7); p. 8–9).

> The Health Care ... Coverage an employee has under this Article at the time of retirement ... shall be continued thereafter ... (Id., Article III § 5(a), P. 71–72).

> [T]he Company shall contribute the full premium or subscription charges for Health Care ... on behalf of a surviving spouse ... of a retired employee, if such spouse is receiving or eligible to receive a benefit under Article II of the ... Pension Plan ... (Id., Article I, 3(b)(8) and Article III, § 6(b)(1), pp. 8, 73).

The provisions of the Detroit/Romulus Insurance Supplement pertaining to retirees and surviving spouse eligibility for health care coverage remained basically unchanged from 1968 through 1980.

The Insurance Supplements for Heintz and SPECO, relating to retiree and surviving spouse health care coverage, were similar to the Detroit/Romulus Insurance Supplements.

The 1968 Gunite collective bargaining agreement contained the following provisions regarding health care benefits for retirees and surviving spouses:

> The Company will pay the full cost of hospital and medical expense coverage ... provided the pensioner is eligible for bene-

fits under Gunite Pension Plan. (1980 Agreement, p. 65–66)

### The Strikes.

During strikes at SPECO in 1971 and 1980, Kelsey–Hayes maintained health care benefits for retirees while terminating them for active employees.

During the 1983 strike at Heintz, Kelsey–Hayes maintained health care benefits for retirees while terminating them for active employees.

During the 1986 strike at Gunite, Kelsey–Hayes maintained health care benefits for retirees while terminating them for active employees.

### The Sold Locations.

In 1987 Kelsey–Hayes sold the Gunite and SPECO divisions to Grabil. Grabil assumed the obligations under the collective bargaining agreements. Under the sale agreement, Kelsey–Hayes retained the liability to provide health care benefits for persons already retired. After the 1987 sale of Heintz and SPECO to Grabil, Kelsey–Hayes provided the same health care benefits to retirees and surviving spouses until January 1, 1994.

Kelsey–Hayes also agreed to provide Grabil with a $20 million letter of credit to guarantee the payment of retiree health care benefits. The letter of credit had an initial term of five years renewable on an annual basis for three years thereafter dependent upon Kelsey–Hayes' debt/equity ratio. The amount of the letter of credit was adjustable depending upon the present value of the retiree health care liability.

In 1987, Kelsey–Hayes sold the Gunite division to Lovejoy. On June 9, 1987, Kelsey–Hayes, UAW Local 718 and Lovejoy agreed that Lovejoy would assume the collective bargaining agreement but that Kelsey–Hayes would remain responsible for pension and welfare benefit "accrued" under the collective bargaining agreement for persons retired prior to the date of the sale.

After the 1987 sale of Gunite to Lovejoy, Kelsey–Hayes continued to provide health care benefits to retirees and surviving spouses at the same levels until January 1, 1994.

### Written Representations.

Beginning as early as 1967, Kelsey–Hayes' benefit representatives assured retirees, surviving spouses of retirees and surviving spouses of employees eligible to retire that they had lifetime health care coverage. The following are examples:

On February 10, 1967 Laura J. Smith of the Kelsey–Hayes Insurance–Pension Department wrote to Detroit retiree Rudolph Schlender that he would be covered under the CBA medical plan "until your death unless you authorize us to discontinue this coverage."

On August 29, 1972, Harry E. Joiner, Director of Industrial Relations at SPECO, wrote to Mary A. Wickerham, the surviving spouse of SPECO retiree Cecil Wickerham:

> As the widow of a retiree eligible for surviving spouse pension benefits, the company will continue monthly payments for your hospital, medical surgical and prescription drug benefits for your lifetime.

On July 29, 1975, Bliss E. Sterling of the Gunite personnel department, wrote to attorney Richard A. Christopher regarding Dorothy Lowery, the survivor of Gunite Retiree Uesker Lowrey:

> The Company does retain medical insurance coverage for her lifetime through Illinois Hospital and Health Service.

On December 20, 1976, Barbara Birk, of the Detroit plant personnel department, wrote to the Veteran's Administration regarding Detroit retiree Larry O. Thompson:

> His Blue–Cross Blue–Shield is paid for by the Company for the rest of his life.

On April 19, 1979 corporate benefits representative Sandra J. Williams wrote to attorney Gad L. Holland regarding Fosteel Themes, the surviving spouse of a Detroit retiree:

> [A]s a surviving spouse of a Kelsey–Hayes Company retiree she is entitled to continued company-paid BC/BS, dental and hearing aid expense coverage for the rest of her life.

On February 4, 1983, Patricia Perkoski, Employee Services Supervisor wrote to Mar-

tha Vaughan, the survivor of a Romulus employee eligible to retire when he died:

> You are entitled to life-time Health Care Benefits (Blue–Cross/Blue–Shield, Dental, Vision, and Hearing Aid) at Kelsey–Hayes Company's expense.

On June 1, 1983, Sharon Shockley, Employee Services Supervisor, wrote to Nannie Griffin, the surviving spouse of a Romulus employee who died while eligible to retire:

> When your Transition Benefits are exhausted you may also be eligible for Bridge benefits. You will have health care benefits for life.

On May 9, 1985, Carol S. Palmer, Benefits Administrator at SPECO wrote to retiree Roy Roach regarding pension benefit overpayments. After explaining pension options, she stated:

> In either of the two options, health care for your spouse will continue for her further lifetime at no cost to her.

On October 3, 1986, Audrey Hart, Gunite benefits representative, wrote to Gunite retiree Dee Gilliam, in response to questions posed by Mr. & Mrs. Gilliam:

> If Dee should die before Ann, Ann will be covered for medical insurance until her death. The coverage would be the same as it is now.

On October 19, 1987, Karen Samborski, Employee Benefits Coordinator, sent Sharon Trivett, the survivor of a deceased Romulus employee a Benefits Summary stating:

> All Kelsey–Hayes health care coverage will continue through your life time at the expense of Kelsey–Hayes Company.

**Internal Documents.**

On March 24, 1965, Joseph Carey, a Kelsey–Hayes negotiator, wrote a memorandum to Gar Hennen, attaching a list of "Insurance Procedures" effective for bargaining unit employees as of March 1, 1965, as a result of recent negotiations with the UAW.

> The Company shall make suitable arrangements to allow a surviving spouse to continue coverage under the group hospital and surgical program during the period

12. "H–S–M means Hospital, Medical, Surgical."

she is receiving any survivor spouse benefits under any Company insurance or pension program by contributing the monthly group rate. Coverage would be continued for the lifetime of the retiree's spouse.

On February 16, 1973, Renee Slater, a corporate benefits administrator, wrote a memo to the personnel directors at the Detroit and Romulus plants with a copy to John Lott and Joseph Babiarz, both of whom participated in negotiations with the UAW on behalf of Kelsey–Hayes, entitled "Insurance Continuation Rights—Bargaining Unit Employees:"

> In order to eliminate some of the questions regarding the above-captioned matter, I have come up with a summary of continuation rights made in accordance with the Insurance Program ... which should be utilized by your personnel as a guideline for termination of coverage and informing employees of their rights.

Attached to Ms. Slater's 2/16/73 Memorandum were summary sheets entitled "Insurance Continuation Rights" for the 1965, 1968 and 1971 collective bargaining agreements for Detroit and Romulus. Each sheet contained headings for *"Retirement" "Terminating at Age 65 Other than Quit or Discharge with Insufficient Credited Service to Retire"*, and *"Surviving Spouse."*

The 1965 and 1968 summaries, under *"Retirement"*, provided:

> "H–S–M [12]—continuation with Company contribution for life for self and dependents as of 3–1–65 for past and present retirees.

The 1971 summary contained the following language under *"Retirement"*:

> H–S–M—continuation with Company contributions for life for self and dependents.

Each summary, under *"Termination at Age 65 Other than Quit or Discharge with Insufficient Credited Service to Retire"*, contained the following language:

> H–S–M—group continuation for employee only for life with Company contributions.

The 1965 summary contained the following language under "Surviving Spouses":

H–S–M—continuation with spouse contributions for spouse of retire, employee eligible to retire, employee not eligible to retire as long as Survivor Income Benefits payable, or employee terminated at age 65 and not eligible to retire due to insufficient Credit Service.

The 1968 and 1971 summaries had the following language under "Surviving Spouses:"

H–S–M—continuation with Company contributions for spouse of retiree, employee eligible to retire, or employee terminated at age 65 and not eligible to retire due to insufficient Credited Service. Continuation for spouse of employee not eligible to retire as long as survivor income benefits payable with spouse contributions.

When SPECO employee Roy Zinkhon died on August 26, 1978, SPECO benefits administrator Carol Palmer noted the following benefits available to his surviving spouse:

Pension-at age 62, when SIB cease, Jt. annuitant pension benefits commence, payable for life. Insurance companies @ no cost for rest of widow's life.

When SPECO retiree James Swonger died in November, 1980, Ms. Palmer wrote a note about his widow Sadie's benefit entitlement:

Hosp.—Company—paid for life of spouse.

On July 6, 1981, Ms. Palmer wrote to Mary B. Ferres, the surviving spouse of deceased SPECO employee Robert E. Ferres that her health care benefits would terminate as of July 31, 1981. At the bottom of the letter, Ms. Palmer wrote:

Per S. Williams 7/15/81—Mrs. Ferres is entitled to Company-paid health care for her further lifetime because her husband was *eligible* to retire on the day he died. Advised her by phone on July 15, 1981.

In June, 1986, Heintz employee Mykola Kusznir reached 65 years of age but was not eligible for a pension. Kenneth Jankowitz, Heintz industrial relations representative, wrote a summary of Mr. Kusznir's benefits. Next to "Health Ins.:" he referenced Article I, Section 3(B)(6)(ii) of the Insurance Supplement and wrote: "Health care would continue until death."

In 1986, Kelsey–Hayes was considering divesting itself of Heintz, SPECO and Gunite. It calculated the present value of its retiree health care liability for retirees from those divisions. Wyatt Company, Kelsey–Hayes' benefit consultant, advised Kelsey–Hayes to get full value for those liabilities if the purchaser did not assume them.

Hattie Robinson, a benefits representative at the Detroit plant in the late 1980's, prepared Benefits Summaries for the 1985 and 1988 collective bargaining agreements between UAW Local 78 and Kelsey–Hayes. Under the heading "Surviving Spouse Coverage", Ms. Robinson placed the words "company paid (to death)."

**Company Representations During Exit Interviews.**

At the Detroit plant, Barbara Birk was the personnel representative who explained benefits to hourly employees who were retiring from the early 1970's through 1986. Ms. Birk testified at her deposition that she uniformly and consistently informed retiring hourly employees that they and their spouses had lifetime health care coverage.

Hattie Robinson replaced Barbara Birk at the Detroit facility from 1986 through 1989. Ms. Robinson, who is still an employee of Kelsey–Hayes, testified that she told retiring hourly employees that their health care benefits would remain the same and that they would stay the same for the surviving spouse after the death of the retiree. Ms. Robinson testified that she never told retiring hourly employees that the benefits could be reduced or modified or that benefits were dependent upon the continuing existence of a collective bargaining agreement.

Ann Batryn and Jeannine McCormack, longtime corporate benefit representatives, testified that hourly retirees and their surviving spouses had lifetime health care benefits.

Sandra Williams was a corporate benefits administrator from 1974, when she replaced Renee Slater, to the present. Ms. Williams wrote several letters to hourly retirees and surviving spouses assuring them that they have lifetime health care benefits. She testi-

fied that these letters contained an accurate statement of retiree and surviving spouse eligibility for health care benefits. Ms. Williams never told retirees or surviving spouses that benefits could be modified or terminated or were dependent upon the existence of a collective bargaining agreement.

Audrey Hart conducted exit interviews for hourly Gunite employees who were retiring from 1982 through 1987. During exit interviews, she told employees that there would be no change in their health care benefits and, if they died first, their spouses would be covered in the same way. Ms. Hart did not tell retiring employees that their health care benefits could be modified or terminated or were dependent upon the continuing existence of a collective bargaining agreement.

Carol Palmer explained retirement benefits to SPECO employees as they were retiring from the mid–1970's through the 1987 sale. Ms. Palmer also explained benefits available to the surviving spouses in person after the retirees' death. Ms. Palmer informed retirees and surviving spouses that they had lifetime health care benefits. She never told retirees that health care benefits could be reduced or terminated after retirement or that they were dependent upon the continuing existence of a collective bargaining agreement.

Joseph Lees was the Heintz personnel manager from the 1950's until he retired in 1983. He participated in negotiations and explained benefits to retiring hourly employees in the 1970's and the early 1980's. Mr. Lees testified that he always informed retiring hourly employees that they had lifetime health care benefits and that if they died before their spouse, her health care benefits would be provided for her lifetime as well. He trained Jack Carlson and George Myers of the Heintz personnel department to do exit interviews. Mr. Carlson and Mr. Myers told retirees and surviving spouses they had lifetime health care benefits.

## II. Legal Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affida-

vits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the non-moving party's case on which the non-moving party would bear the burden of proof at trial. *Martin v. Ohio Turnpike Commission,* 968 F.2d 606, 608 (6th Cir.1992); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In considering a motion for summary judgment, the court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the non-moving party. *60 Ivy Street Corporation v. Alexander,* 822 F.2d 1432, 1435 (6th Cir.1987). The court is not required or permitted, however, to judge the evidence or make findings of fact. *Id.* at 1435–36. The moving party has the burden of showing conclusively that no genuine issue of material fact exists. *Id.* at 1435.

A fact is "material" for purposes of summary judgment where proof of that fact would have the effect of establishing or refuting an essential element of the cause of action or a defense advanced by the parties. *Kendall v. Hoover Co.,* 751 F.2d 171, 174 (6th Cir.1984). In other words, the disputed fact must be one which might affect outcome of the suit under the substantive law controlling the issue. *Henson v. National Aeronautics and Space Administration,* 14 F.3d 1143, 1148 (6th Cir.1994). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* Accordingly, where a reasonable jury could not find that the non-moving party is entitled to a verdict, there is no genuine issue for trial and summary judgment is appropriate. *Feliciano v. City of Cleveland,* 988 F.2d 649 (6th Cir. 1993).

Once the moving party carries its initial burden of demonstrating that no genuine issues of material fact are in dispute, the burden shifts to the non-moving party to present specific facts to prove that there is a genuine issue for trial. To create a genuine

issue of material fact, the non-moving party must present more than just some evidence of a disputed issue. As the United States Supreme Court stated in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986):

> There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the [non-moving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

(Citations omitted); *see also Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Consequently, the non-moving party must do more than raise some doubt as to the existence of a fact; the non-moving party must produce evidence that would be sufficient to require submission of the issue to the jury. *Lucas v. Leaseway Multi Transp. Serv., Inc.*, 738 F.Supp. 214, 217 (E.D.Mich.1990), *aff'd*, 929 F.2d 701 (6th Cir.1991).

### III. Applicable Law

#### Regarding the SPD's.

Plaintiffs rely primarily on *Helwig v. Kelsey–Hayes, supra. Helwig* is a companion case to the instant case in which the SPD's issued therein are indistinguishable, if not identical, to the SPD's issued here. The Sixth Circuit, in no uncertain terms, stated that the *Helwig* SPD's contain "clear, unambiguous promises of lifetime coverage and contained no valid provisions reserving the right to modify or terminate the benefits conferred." *Helwig*, 93 F.3d at 251. In arriving at that conclusion, the court, relying on *Edwards v. State Farm Mutual Automobile Insurance, Co.*, 851 F.2d 134 (6th Cir. 1988), stated that an "employer[ ] may not construct SPD's in such a manner that they mislead employees into thinking they have a right to benefits when other documents obliquely negate those rights. (citations omitted)." *Id.* at 250. In *Edwards*, the Sixth Circuit stated that "statements in a summary plan are binding and if such statements conflict with those in the plan itself,

the summary shall govern." *Edwards*, 851 F.2d at 136. In concluding that the "benefits vested at the time each Plaintiff retired," *Id.* at 251, the *Helwig* court stated that "[i]n this circuit, ... Companies are held to the promises they make in their SPD's." *Id.* at 249.

#### Regarding the collective bargaining agreement.

At the outset, this court notes, with some dismay, the defendants' attempt to re-argue the applicability of *Yard–Man, supra*, to the instant case. The Sixth Circuit, however, has stated, in a prior appeal in this case, that "after considering the arguments the defendant makes, and the cases it cites, we conclude that *Yard–Man* is still good law, and controls this case. The district court did not err in following it." *Golden v. Kelsey–Hayes*, 73 F.3d 648, 656 (6th Cir.1996).

In *Yard–Man*, the Sixth Circuit addressed the same issue as in the instant case, namely, whether retirees' health insurance benefits terminate at the expiration of the current collective bargaining agreement or whether they continue for the lifetime of the retiree. The court stated that resolution of this question depends on the intent of the parties to the collective bargaining agreement. *Yard–Man*, 716 F.2d at 1479. First, a court must look to the express provisions of the agreement construing each section "consistently with the entire document and the relative positions and purposes of the parties." *Id.* at 1479–80. The court should interpret each provision in question as part of an integrated whole. CBA's must be construed so as to render no provision nugatory and to avoid illusory promises. *Id.* Where the express language of a retiree benefit plan is ambiguous as to the duration of retiree health insurance, courts should look to other provisions of the agreement. *Id.* at 1482. Extrinsic evidence is admissible to determine an intent to vest benefits when the language of the CBA is ambiguous. *Cf. Yard–Man, supra*, at 1480 n. 1 (implying that extrinsic evidence could have been presented). *See also Golden*, 73 F.3d at 656.

In determining the duration of retiree health benefits, the court noted that:

examination of the context in which these benefits arose demonstrates the likelihood that continuing insurance benefits for retirees were intended. Benefits for retirees are only permissive not mandatory subjects of collective bargaining. (citation omitted). As such, it is unlikely that such benefits, which are typically understood as a form of delayed compensation or reward for past services, would be left to the contingencies of future negotiations. *Yard–Man*, 716 F.2d at 1482. The Sixth Circuit recognized that employees are aware when they accept retiree benefits in exchange for lower wages, that they cannot rely on their union to maintain those benefits once they have retired and left their bargaining unit. Thus, "finding an intent to create interminable rights to retiree insurance benefits in the absence of explicit language, is not, in any discernible way, inconsistent with federal labor law." *Id.*

The Sixth Circuit also held that specific intent to confer lifetime benefits take precedence over a non-specific general durational clause. *Yard–Man*, 716 F.2d at 1482. *See also Schalk v. Teledyne*, 751 F.Supp. 1261, 1265–66 (W.D.Mich.1990) (rejecting the argument that general durational clause in insurance agreement controlled duration of retiree health care benefits.) *aff'd* 948 F.2d 1290 (6th Cir.1991); *Fox v. Massey–Ferguson*, Civil Action No. 93–CV–74615 (E.D.Mich. May 31, 1995) (same) *aff'd*, 91 F.3d 143, 1996 U.S.App. Lexis 19150 (6th Cir.1996) (Rule 24 cases).

The Sixth Circuit also found that retiree benefits are in a sense "status" benefits which carry an inference that they continue as long as the requisite status is maintained. This contextual factor, according to the Sixth Circuit, can buttress "the already sufficient evidence of such intent in the language of the agreement itself." *Yard–Man*, 716 F.2d at 1482. The Sixth Circuit, however, cautioned that "there is no legal presumption based on the status of retired employees." *International Union, United Auto. Workers v. Cadillac Malleable Iron Co.*, 728 F.2d 807, 808 (6th Cir.1984). Moreover, the Sixth Circuit stated, in this case, that "*Yard–Man* does not shift the burden of proof to the employer, nor does it require specific anti-vesting lan-guage before a court can find that the parties did not intend benefits to vest." *Golden*, 73 F.3d at 656.

## IV. Analysis

### Regarding the SPD's.

Defendants do not contend that there is a valid reservation of rights provision in the SPD's described above, nor do they contend that a genuine issue of material fact exists as to the language contained in those SPD's. Instead, defendants argue that this court should ignore controlling Sixth Circuit precedent or alternatively, urge this court to await the Sixth Circuit's decision in *Sprague v. General Motors Corp.*, 92 F.3d 1425, *reh'g en banc granted and vacated*, 102 F.3d 204 (6th Cir.1996) which is scheduled for oral argument on April 23, 1997.

Defendants argue that since the Sixth Circuit's *Helwig* decision relied on *Sprague* and since *Sprague* is now scheduled for an *en banc* hearing, the *Helwig* opinion should not be relied on by this court. Defendants claim that the issue before the Sixth Circuit *en banc* is whether an SPD can be enforced to create welfare benefit vesting when the plan itself expressly reserves the right to terminate the plan. The defendants, moreover, contend that the "plan" is the underlying master agreement between the company and the insurance carrier in which such reservation of rights language can be found.

There are several problems with the defendants' arguments. First, the *Helwig* opinion does not rely on *Sprague*. Instead, it relies on *Edwards* in which the Sixth Circuit held that statements made in SPD's are binding, and if they conflict with statements made in the plan itself, the SPD controls. *Edwards*, 851 F.2d at 136. That the *Helwig* court did not rely on *Sprague* is evidenced by thirty references to *Edwards* in the *Helwig* opinion as compared to one reference to *Sprague* in that opinion. That reference was merely for the proposition that the *Edwards* holding is applicable to welfare benefits as well as disability benefits. The Sixth circuit had to rely on *Sprague* for this proposition since *Edwards* involved disability benefits and not welfare benefits. The *en banc* court, however, is most certainly not reconsidering wheth-

er *Edwards* should extend to welfare benefits, an argument the defendants do not even attempt to make. Accordingly, it can not be said that *Helwig* relied on *Sprague.*

Second, the defendants are mistaken that the "plan," in this case, is the underlying insurance agreement between the company and the insurance carrier and that reservation of rights language therein is controlling. The plan is the Insurance Supplements to the CBA, or, in the case of Gunite, the CBA itself, *see generally Golden,* 73 F.3d at 648 (discussing the CBA), and not the underlying insurance agreement. The Sixth Circuit has already rejected defendants' argument that the underlying insurance policy controlled over the SPD. *Helwig* 93 F.3d at 250. That said, the defendants have not put forth any evidence that the Insurance Supplements or the CBA contained valid reservation of rights language.

Third, *Sprague,* is distinguishable from *Helwig* and *Golden.* In *Sprague,* there is an issue as to whether the SPD's, which arguably contained reservation language, could create welfare benefit vesting. *See Sprague,* 92 F.3d at 1438 (quoting the "changed from time to time" language in the SPD's). That issue, however, is irrelevant for our purposes since no such language appears in the SPD's issued herein. Moreover, the Sixth Circuit has already found that none of the SPD's issued herein contained any valid reservation language. *See Helwig,* 93 F.3d at 250–51.

For these reasons, it can not be said that this court cannot rely on *Helwig*[13] or, instead, must await the *en banc* decision.

The defendants also argue that allowing the SPD to trump the plan contradicts Supreme Court Jurisprudence. They rely, primarily, on *Curtiss–Wright Corp. v. Schoonejongen,* 514 U.S. 73, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995). There, the Court stated that "ERISA does not create any substantive entitlement to employer-provided health benefits or any other kind of welfare benefits. Employers or other plan sponsors are *generally* free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans." *Id.* 514 U.S. at ——, 115 S.Ct. at 1228. (emphasis added). Therefore, the presumed right to amend the welfare benefit plan, the defendants reason, is a statutory right and that right can only been waived by clear and express language which is not present in the instant case.

This argument, however, has been rejected by the Sixth Circuit in appeals taken in *Helwig* and in *Fox v. Massey–Ferguson,* 93–CV–74615 (Rule 24 Case). Moreover, it is contrary to the Sixth Circuit's holding, in *In re White Farm Equipment Co.,* 788 F.2d 1186 (6th Cir.1986). There, the Sixth Circuit held that an employer can agree to vest health care benefits "by agreement or private design" and that the question of whether it did so is one of contractual interpretation. *Id.* at 1193. *See also Golden,* 73 F.3d at 655.

The Sixth Circuit's holding in *White Farm* is not inconsistent with the Supreme Court's holding in *Curtiss–Wright* and was, in fact, cited indirectly by the *Curtiss–Wright* court.[14] Instead, *White Farm* can easily be read within the *Curtiss–Wright* framework that the "general" freedom to adopt, modify or terminate can give way to a contractual obligation to provide vested benefits when they have been conferred by "agreement or private design."

Finally, defendants urge this court to adopt the view taken by other circuit courts which require the plaintiff to show detrimental reliance on the SPD provisions before he or she can enforce those benefits. However, *Helwig* and *Edwards* do not require a showing of detrimental reliance and are controlling precedent.

---

13. Notably, certiorari was just *denied* in *Helwig* on January 6, 1997 giving even further support to plaintiffs' position.

14. The Supreme Court, in *Curtiss–Wright,* cited *Adams v. Avondale Industries, Inc.,* 905 F.2d 943 (6th Cir.1990) for the proposition that employers are "generally" free to adopt, modify or terminate welfare benefit plans. In *Adams,* the Sixth Circuit declined to give plan administrators "carte blanche to amend or terminate" welfare benefits, citing, *White Farm's* "rather modest rule" that these benefits can be vested by "agreement or private design." 905 F.2d at 949.

For the above stated reasons, this court finds, as a matter of law, that the SPD's herein promise lifetime health care coverage for retirees or their surviving spouses. Accordingly, this court will grant plaintiffs' motion for summary judgment on liability as to those plaintiffs who were employed at the Detroit/Romulus, Gunite and Heintz plants and who retired on or after December 1, 1977 as well as to those plaintiffs who were employed at the SPECO plant and who retired on or after March 1, 1978.

**Regarding the collective bargaining agreement.**

As a second ground for summary judgment, plaintiffs rely on the collective bargaining agreements themselves. Specifically, plaintiffs point to the express provisions found in the Insurance Supplements, a course of conduct by the defendants during strikes and after it sold the SPECO, Gunite, and Heintz divisions, as well as other extrinsic evidence including the SPD's, internal memoranda, letters to retirees and surviving spouses, and exit interviews with retiring employees.

Plaintiffs argue that the following provisions in the insurance supplements, common to Detroit/Romulus, SPECO and Heintz locations, directly tie health care benefits to pension eligibility thereby evincing an intention for lifetime health care benefits for retirees. Those provisions state:

> The Company shall contribute the full premium or subscription charge for health care ... coverage ... for ... a retired employee and his eligible dependents *provided such retired employee is eligible for benefits under Article II of the ... Pension Plan.* (emphasis supplied)

> The Health Care ... Coverage ... an employee has under this Article at the time of retirement ... shall be continued thereafter....

The 1986 Gunite CBA contains a similar provision stating that "The Company will pay the full cost of hospital and medical expense coverage of currently enrolled pensioners ... provided the pensioner is eligible for benefits under the Gunite Pension Plan.

Defendants maintain that there is no express provision for vesting in the agreements and that the general durational clause should control over specific language conferring health care benefits on retirees. Moreover, they contend that the contracts simply extend to former employees who are retired, the benefits extended to current employees using pension receipt to define eligibility only and not length of entitlement. Such a strained reading of the contract provisions, however, has previously been rejected by this court. *See Golden,* 845 F.Supp. at 414. Instead, this court held "that eligibility for retiree health benefits is tied to eligibility for lifetime pension benefits or survivor spouse income." *Golden,* 845 F.Supp. at 415. The Sixth Circuit affirmed this court's conclusion. *Golden,* 73 F.3d at 656.

In an attempt to further support their position, defendants, in great detail, canvass the over-thirty-year bargaining history between the company and the union ultimately seizing upon the fact that no negotiator could testify to any discussions between the company and the union over "vesting" of retiree or surviving spouse medical benefits.

At best, however, this "evidence" demonstrates that the deponents can not remember whether vesting of retiree and surviving spouse medical benefits was ever discussed at any of these negotiations which occurred, in some instances, over thirty years ago.[15]

---

15. One possible reason why there was no mention of vesting of retiree and surviving spouse medical benefits was put forth by Eugene Loren who was a staff consultant in the benefits department at the UAW and then was the Director of Personnel Services at Kelsey–Hayes. Mr. Loren testified that the UAW thought they had negotiated lifetime health care benefits for retirees. Moreover, Loren testified, the contractual promise had been made, in whatever form, by the time he went to Kelsey–Hayes from the UAW in 1979. Thereafter, Loren testified, the issue was raised internally and a decision was made not to raise it at the bargaining table because it would certainly lead to a strike.

Loren's testimony is supported by Jim Walworth, the International UAW's benefit representative in 1965, 1968 and 1971 who testified that while he could not recall specific discussions regarding health care benefits for retirees, his presumption was that the benefits, being retirement benefits, lasted for life. Walworth also testified that once lifetime retiree health care

In any event, this court is not prepared to find a genuine issue of material fact precluding summary judgment on such dubious evidence. Instead, this court will base its analysis on more trustworthy [16] evidence such as the express language of the agreements themselves. This court finds, once again, that the language in the agreements directly tie retiree eligibility for health care coverage to pension entitlement and therefore is a clear indicia that Kelsey–Hayes intended to provide lifetime health care coverage.

■ Even assuming, *arguendo*, that the contractual language cited above is ambiguous, an examination of other provisions of the agreements supports a finding that Kelsey–Hayes intended to provide lifetime health care coverage. For instance, there are several provisions in the agreements that specifically set durational limits on health care benefits. Thus, active employees who were laid off received up to twelve months of continued health care coverage. Disabled employees received company paid health care coverage for the length of the disability or seniority. Surviving spouses of active employees eligible for bridge benefits but not otherwise eligible for company paid health care were entitled to six months of health care coverage. As to retirees, however, there was no such limitation expressed or implied.

In *Yard–Man*, the Sixth Circuit held that "the inclusion of specific durational limitations in other provisions of the ... collective bargaining agreement suggests that retiree benefits, not so specifically limited, were intended to survive the expiration of successive agreements in the parties' contemplated long term relationship." *Yard–Man*, 716 F.2d at 1481–82. Accordingly, this court finds that these provisions further support a finding that the parties intended that the plaintiffs have a vested right to receive lifetime health care coverage.

As to course of conduct, it is undisputed that during the four lengthy identified

strikes at the various locations, SPECO in 1971 and 1980, Heintz in 1983 and Gunite in 1986, Kelsey–Hayes continued to pay for retiree health care coverage while requiring the UAW to pay for health care coverage for active employees. Defendants feebly respond by offering the deposition testimony of Messrs. Collie and Chrapkiewicz who testified that they never heard that Kelsey–Hayes could not terminate retiree medical coverage, even during a strike. Moreover, defendants' contention at oral argument that Kelsey–Hayes' conduct during the strikes merely evinces a unilateral contract is simply self-serving.

Course of conduct evidence is, of course, proper to consider in a *Yard–Man* analysis. *See Yard–Man*, 716 F.2d at 1481 n. 5. Other courts have held that the payment of retiree health care benefits during periods when no contract was in effect is evidence of an intent to provide lifetime health care benefits. *Bower v. Bunker Hill Co.*, 725 F.2d 1221, 1225 (9th Cir.1984); *Int'l Union, United Auto Workers v. Cadillac Malleable Iron Co.*, 1982 WL 20483, *8 (W.D.Mich.1982) *aff'd*, 728 F.2d 807 (6th Cir.1984).

Additionally, course of conduct evidence shows that when Kelsey–Hayes considered selling the Heintz, SPECO and Gunite divisions, it calculated retiree health care benefits as a present value obligation, based on retiree mortality. Kelsey–Hayes gave the purchaser of Heintz and SPECO, who assumed the labor contracts, a five year $20 million letter of credit renewable for three additional years, which is roughly the amount of the present value of the obligation, for a term of eight years. At Gunite, Kelsey–Hayes agreed with the UAW and the purchaser that it remained responsible for "accrued" retiree welfare benefits. After the sale, Kelsey–Hayes continued to provide the benefits for retirees for more than six and one-half years, until it made the changes which led to this lawsuit.

benefits were negotiated in 1965, there would have been no reason to revisit that issue in 1968 or 1971.

**16.** The lack of credible witness testimony due to the passing of time, as a practical matter, bodes in favor of deciding this matter at the summary judgment stage as these witness' testimony can not expect to improve at the time of trial.

Defendants' hasty retort, that the letter of credit merely evinces that the purchaser "struck a hard bargain" and that the term of eight years only undercuts plaintiffs' position that the benefits vested, is not persuasive. In any event, Kelsey–Hayes' conduct, regarding the strikes and the sold locations, is clearly inconsistent with its current claim that these benefits were terminable at the end of the term of a collective bargaining agreement. As such, this court finds that the course of conduct is an indicia that the benefits were intended to vest.

■ Finally, plaintiffs point to extrinsic evidence that they claim demonstrates that the benefits were clearly intended to be lifetime. First, plaintiffs point to the SPD's discussed above. Suffice it to say, even if this court had not found the SPD's binding, *see* discussion *supra,* they certainly "provide strong extrinsic evidence to support Plaintiffs' reading of the collective bargaining agreement." *Hinckley v. Kelsey–Hayes Co.,* 866 F.Supp. at 1034 n. 8 (E.D.Mich.1994). Defendants do not challenge the effect of the SPD's as extrinsic evidence.

Second, plaintiffs point to an internal memo distributed by Rene Slater of the corporate benefits department to benefits personnel in February, 1973. In that memo, she summarized the insurance continuation rights under the 1965, 1968 and 1971 labor contracts and described retiree rights to health care as "continuation with Company contribution for life." Defendants maintain, however, that Ms. Slater had no authority to summarize benefits, that she was extraneous to the collective bargaining process and that Mr. Babiarz, who was the vice-president of personnel and human resources and was copied on the document, did not recall receiving the memo, albeit, some twenty-three years later.

Regardless, Mr. Babiarz testified that Ms. Slater was the most knowledgeable person regarding benefit matters and that he depended on her with respect to benefit matters. Moreover, Kelsey–Hayes cites no case which would prohibit this court from considering Ms. Slater's admission simply because she was not present at the negotiations.[17] In

fact, courts have relied on statements by benefit representatives as evidence of intent. *See, e.g., Cadillac Malleable Iron Co., supra,* 1982 WL 20483, *8.

Third, for a period of 20 years, more than a dozen different Kelsey–Hayes benefits representatives continually assured retirees and surviving spouses, at all locations, in writing, that they would have lifetime health care coverage. Defendants do not challenge this extrinsic evidence.

Finally, at each location, benefit representatives conducted interviews with retiring bargaining unit employees, during which retiring employees were informed that they would have lifetime health care benefits for themselves and their surviving spouse. Defendants do not challenge this extrinsic evidence.

Even absent the course of conduct or extrinsic evidence, this court would grant summary judgment in favor of plaintiffs as the express contract language in this case is even more compelling than that found in *Yard–Man. See Yard–Man,* 716 F.2d at 1480. With the addition of course of conduct and extrinsic evidence, however, a veritable mountain of evidence is created which defendants have failed to surmount. This court need not rely on the *"Yard–Man* inference," however, it is still part of the relevant analysis, *see Golden,* 73 F.3d at 656, and as such only serves to make the defendants' "ascension" that much more futile.

### Conclusion

For the reasons stated above, this court will grant plaintiffs' motion for summary judgment.

### *ORDER*

**IT IS HEREBY ORDERED** that plaintiffs', a class of retired hourly wage employees of the defendants, Kelsey–Hayes Company and Hayes Wheels International, Inc., or their surviving spouses, motion for summary judgment, pursuant to Federal Rule of Civil

---

17. Babiarz testified, however, that Slater was in the back room during negotiations.

Procedure 56(c), as to liability is **GRANTED** in its entirety.

**SO ORDERED.**